IN THE UNITED DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY

| | |
|---|---|
| VELMA JUANITA HOWELL, individually, and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>v.<br><br>SELECTQUOTE INSURANCE SERVICES,<br><br>Serve registered agent at:<br>Cogency Global, Inc.<br>2101 SW 21st Street<br>Topeka, Kansas 66604<br><br>*Defendant.* | Case No.  2:24-cv-2480<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Velma Juanita Howell ("Howell" or "Plaintiff"), through her counsel, and on behalf of herself and all others similarly situated, files her Class Action Complaint against Defendant SelectQuote Insurance Services ("SelectQuote" or "Defendant"), and states:

**INTRODUCTION AND BACKGROUND ON THE TCPA**

1. Plaintiff Velma Juanita Howell ("Plaintiff" or "Howell") brings this case to protect her privacy rights, namely the right to be left alone from unwanted telemarketing phone calls.

2. Plaintiff brings this suit to get telemarketers like SelectQuote Insurance Services ("SelectQuote" or "Defendant") to stop calling her phone and the putative class members' phones despite the fact Plaintiff and the putative class members registered their phone numbers on the National Do-Not-Call Registry ("DNC List").

3. In 1991, after passage with bipartisan support in Congress, President George H.W. Bush signed the Telephone Consumer Protection Act ("TCPA") into law, to protect consumers'

consumers' privacy rights, namely, the right to be left alone from unwanted telemarketing calls. A leading sponsor of the TCPA described unwanted telemarketing calls as "the scourge of modern civilization." 137 Cong. Rec. 30821 (1991).

4. The TCPA affords protections for people who registered their phone numbers on the National Do Not Call Registry. Specifically, the TCPA provides that each person who receives more than one call on their phone after being registered on the National Do Not Call Registry is entitled to recover a penalty of up to $500 per call, and up to $1,500 per call if the TCPA is willfully or knowingly violated. *See* 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c).

5. Since 2003, persons who register their cell phone numbers on the DNC List are considered "residential subscribers" for the purpose of 227(c)(5) and the DNC List. *In Re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003) ("we will presume wireless subscribers who ask to be put on the national do-not-call list to be 'residential subscribers.'")

6. From January 2024 through September 2024, approximately 38.8 billion robocalls were placed in the United States. RobocallIndex.com, YouMail Robocall Index, https://robocallindex.com/history/time (last visited Oct. 2, 2024).

7. Decades after the TCPA passed into law, it is still unfortunately the case that "month after month, unwanted telemarketing calls and texts top the list of consumer complaints received by the [Federal Communications] Commission." *Omnibus TCPA Order*, 30 FCC Rcd. 7961, 7964 (F.C.C. July 10, 2015).

8. In fact, in 2023 alone, there were over there were over two million do-not-call complaints to the FTC about unwanted telemarketing calls. Federal Trade Commission, *FTC Issues Biennial Report to Congress on the National Do Not Call Registry* (Jan. 8, 2024) *available*

*at*: https://www.ftc.gov/news-events/news/press-releases/2024/01/ftc-issues-biennial-report-congress-national-do-not-call-registry (last visited Oct. 4, 2024).

9. The private right of enforcement of the TCPA is critical to stopping the proliferation of these unwanted telemarketing calls. For example, while the Federal Communications Commission levied over $200 million in penalties against telemarketers between 2015 and 2018, it collected less than $7,000 of that amount. *See* Sarah Krouse, *The FCC Has Fined Robocallers $208 Million. It's Collected $6,790*, THE WALL STREET JOURNAL, March 28, 2019, https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803.

## JURISDICTION AND VENUE

10. This Court has subject-matter jurisdiction over the TCPA claims in this action under 28 U.S.C. § 1331, which grants this court original jurisdiction of all civil actions arising under the laws of the United States.

11. This Court has personal jurisdiction over Defendant because Defendant's principal place of business in Kansas, Defendant transacts business in Kansas and Defendant sells various insurance-related products and services in Kansas.

12. Howell was (and is) a resident of and a citizen of the State of Florida at all times relevant to this Complaint.

13. Venue is proper under 28 U.S.C. §§ 1391(b)(2) as a substantial portion of the events giving rise to the claim arose in this District and Defendant is headquartered within this District.

## PARTIES

14. At all times relevant to this Complaint, Howell was the owner of a phone bearing number 863-XXX-0925.

15. Howell registered her phone number on the DNC List on or about May 21, 2009, to avoid receiving unwanted telemarketing calls.

16. Howell's phone number is a personal phone number and is not a business line.

17. The monthly bill associated with Howell's phone number was issued in Howell's name, and not in the name of a business.

18. Howell used her cell phone primarily for residential purposes, such as communicating with friends and family members.

19. Defendant is registered in the State of Kansas as a foreign for-profit corporation that is incorporated in California, with its principal place of business in Kansas.

20. Defendant's primary business is to sell various insurance products – including life, home and auto, and Medicare insurance products.

21. Howell did not provide prior express written consent or any form of consent to Defendant to contact her on her phone.

## SELECTQUOTE'S AGGRESSIVE AND HARASSING TELEMARKETING PRACTICES

22. Defendant markets its insurance products, in part, through telemarketing.

23. Former employees of Defendant have described Defendant's telemarketing as follows:

> What is the most stressful part of working at the company?
> . . . poor leads . . .
>
> What is a typical day like for you at the company?
>
> 9am-6pm taking inbound calls from senior citizens that didn't initiate the call, are too sick to qualify for a regular final expense policy and have no savings, living month to month off only their SSI.
>
> \*\*\*

> No proper training just rush you to work, they boast three weeks of training but you will be on the phones in four days. You're thrown to the wolves without recourse and it counts in your metrics even though you're (sic) training.
>
> \*\*\*
>
> Leads are trash, most are cold called . . .
>
> Most leads are too old and senile to understand why they are talking to you . . .

24. Despite not inquiring of Defendant's insurance products, having her phone number registered on the DNC List, and not providing Defendant any form of consent to contact her on her phone, in October 2021, Defendant or others acting on its behalf began placing annoying and unwanted telemarketing calls to Howell's phone.

25. On October 7, 2021, Defendant or those acting on Defendant's behalf placed a telemarketing call to Howell's phone. The representative on the other line attempted to sell Howell health insurance and identified their company as SelectQuote. Howell politely declined, as she did not want or need medical insurance.

26. On October 14, 2021, Defendant or those acting on Defendant's behalf again placed a telemarketing call to Howell's phone. The representative on the other line again attempted to sell Howell health insurance and again identified their company as SelectQuote. Again, Howell indicated she was not interested in health insurance.

27. On October 16, 2021, at approximately 1:54 p.m, Defendant or those acting on Defendant's again behalf placed a telemarketing call to Howell's phone. The representative on the other line again attempted to sell Howell insurance and again identified their company as SelectQuote. Howell again told SelectQuote she was not interested in its insurance policies.

28. On October 16, 2021, at approximately 3:38 p.m, Defendant or those acting on Defendant's again behalf placed a telemarketing call to Howell's phone. The representative on

the other line again attempted to sell Howell insurance and again identified their company as SelectQuote. Howell then hung up.

29. On October 21, 2021, at approximately 3:38 p.m, Defendant or those acting on Defendant's again behalf placed a telemarketing call to Howell's phone. The representative on the other line again attempted to sell Howell insurance and again identified their company as SelectQuote. Howell again told SelectQuote to stop calling.

30. The phone numbers that appeared on Howell's caller ID showed that the calls supposedly originated from phone numbers bearing Florida area codes. On information and belief, these phone numbers were spoofed so as it to make it more likely that Howell, a Florida citizen, would answer a call from a phone number bearing a Florida area code.

31. Numerous consumers, like Howell, have also complained about receiving unwanted and harassing telemarketing calls from Defendant. For example, many consumers have complained about such calls to the Better Business Bureau ("BBB").

32. One consumer complained to the BBB:

> This company has been relentlessly spamming my phone for well over a year, often multiple times a day. They appear to be using phone spoofing and offshore call centers. They've basically rendered my phone useless without the aid of a paid spam blocking ap, and even then sometimes they get through. . . .

33. Another consumer complained to the BBB:

> [They] use illegal tactics and offshore call centers from India to fill their sales funnels. Preying on the weakest in society and using three layers of call transfers before putting me thru to some low life with Select Quote. . . .

34. Another consumer complained to the BBB:

> This company . . . has been repeatedly calling both of my cellphones, even though I am on the Federal Do Not Call list, and they have been told to stop numerous times. . . . I have never asked them for information, or gave them any permission to call me. . . .

35. Another consumer complained to the BBB:

I am being harassed by SelectQuote out of Overland Park, Kansas. The company SelectQuote, has third-party callers that call me every single day often multiple times a day using spoofed or otherwise 'fake' local numbers. The company ask[s] if I want Medicare or Medicaid quotes. I repeatedly asked to be taken off the call list and everyday they call again. . . .

36. Another consumer complained to the BBB:

This company has been calling me repeatedly for weeks. I have requested to be taken off the list and not called again multiple times, yet they continue to harass me and interfere with my personal life. This should be illegal harassment!

37. Another consumer complained to the BBB:

Every day I receive a minimum of 10 calls from random incorrectly identified numbers from SelectQuote associates trying to get me to purchase SelectQuote Medicare insurance. I have never contacted this company either by phone or by website or email. . . . I am registered on the do not call registry and they are violating the law. . . .

38. Howell found the calls from or on behalf of SelectQuote to be irritating, disruptive and invasive.

## DIRECT AND VICARIOUS LIABILITY

39. Without the benefit of discovery, and because Defendant disclosed their identity in the telemarketing calls at issue, Howell assumes Defendant directly placed the calls at issue.

40. However, if some or all of the calls were made by third-party/parties on behalf of Defendant, in the alternative, Defendant is vicariously liable for those calls.

41. On May 9, 2013, the FCC determined that telemarketers like Defendant cannot avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside of the United States, as is often the case. Even where third-party

> telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain relief. As the FTC noted, because "[s]ellers may have thousands of "independent" marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re: Dish Network, LLC,* 28 F.C.C. Rcd. 6574 at 6588 (May 9, 2013) (internal citations omitted).

42. Moreover, the May 2013 FCC ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal actual agency and immediate direction and control over third parties who place a telemarketing call. *Id*. at 6587 n. 107.

43. The evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593.

44. If Defendant directly placed the calls at issue to Howell and the putative class members, Defendant is directly liable for the placing of those calls.

45. However, Defendant may have hired, encouraged, permitted, and enjoyed the benefits of mass telemarketing by third-party telemarketers.

46. If Defendant did not directly place the calls to Howell and the putative class members, Defendant's third-party telemarketers had actual and/or apparent authority to act on behalf of Defendant.

47. Likewise, on information and belief, Defendant also ratified its agents' violations of the TCPA by accepting insurance premiums from sales imitated by unlawful telemarketing communications.

48. Defendant controlled or had the right to control the marketing activities of those acting on its behalf.

49. Defendant acted as a principal to telemarketing agent(s) who were acting on their behalf.

50. Defendant is not permitted under the law to outsource and contract their way out of liability by directing and benefitting from their agents' TCPA violations.

51. For the count identified below, if Defendant directly placed the calls at issue, they are directly liable. Alternatively, to the extent any calls were placed by a third-party agent(s) acting on Defendant's behalf, Defendant is vicariously liable for those unlawful communications.

## Class Allegations

52. Pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), Howell brings this lawsuit as a class action on behalf of herself and all others similarly situated. This action satisfies the requirements of Rule 23.

53. Howell seeks to represent the following class:

For the four-year period prior to the filing of this lawsuit to the date of class certification, all persons:

(1) who received two or more calls during a 12-month period in connection with the marketing of Defendant's products or services;

(2) whose number was registered on the DNC List for more than 30 days at the time the calls were received; and,

(3) whose number is registered to an individual and not a business.

54. Howell reserves the right to add administrative subclasses, or to amend the definition of the proposed class, during the lawsuit proceedings.

55. The members of the proposed class are so numerous that joinder of all members is impracticable. Howell reasonably believes that hundreds or thousands of people have been harmed

by Defendant's actions. The phone numbers of the members of the proposed class are readily identifiable through records available to Defendant or those acting on its behalf.

56. Most members of the proposed class have suffered damages in an amount such that it would make filing separate lawsuits by individual members economically infeasible.

57. On information and belief, Defendant has called, and continues to call, people whose numbers are registered on the DNC List. It is reasonable to expect that Defendant will continue to place such calls, absent this lawsuit.

58. Common questions of law and fact exist as to all members of the proposed class and predominate over any questions affecting only individual members. The questions of law and fact common to the proposed class include, but are not limited to:

    a. Whether Defendant's conduct of placing calls to persons whose phone numbers are registered on the DNC List violates 47 U.S.C. § 227(c);

    b. Whether the calls were "solicitations" as defined by the TCPA;

    c. whether Defendant maintained and implemented legally sufficient protocols for obtaining consumer "consent" to place telemarketing calls or send text messages to numbers on the DNC List;

    d. Whether Defendant's conduct violates the rules and regulations implementing the TCPA; and,

    e. Whether Howell and the putative class members are entitled to increased damages for each violation based on the willfulness of Defendant's conduct.

59. Howell's claims are typical of the claims of the proposed class members because her claims arise from the same practice that gives rise to the claims of the members of the proposed class and are based on the same legal theories.

60. Howell and her counsel will fairly and adequately protect the interests of the members of the proposed class. Howell's interests do not conflict with the interests of the proposed class she seeks to represent. Howell has retained lawyers who are competent and experienced in class action litigation, TCPA litigation and consumer law.

61. Howell's counsel will vigorously litigate this case as a class action, and Howell and her counsel are aware of their responsibilities to the putative members of the class and will discharge those duties.

62. A class action is superior to all individual lawsuits for this controversy. Joinder of all proposed members of the proposed class in one action is impracticable if not impossible and prosecuting hundreds or thousands of individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most, members of the proposed class, a class action is the only procedural mechanism that will allow recovery. Even if members of the proposed class had the resources to pursue individual litigation, that method would be unduly burdensome to the courts. Individual litigation could also result in inconsistent adjudications.

63. In contrast, a class action is superior in that it will benefit the court and litigating parties through efficiency, economy of scale and unitary adjudication resulting from supervision of the litigation by a single court.

64. Questions of law and fact, particularly the propriety of placing calls to phone numbers on the DNC List, predominate over questions affecting only individual members.

65. Defendant has acted or refused to act on grounds that apply generally to the class, making final injunctive relief or corresponding declaratory relief is appropriate with respect to the class as a whole.

**Count I - Violations of the Telephone Consumer Protection Act ("TCPA"),
47 U.S.C. § 227(c) *et seq.* (National DNC List Violations)**

66. Howell incorporates by reference the allegations of the previous paragraphs as if fully stated in this Count.

67. The TCPA provides that it is a violation of the law for a person whose phone number is registered on the DNC List to receive more than one call on their phone "within any 12-month period by or on behalf of the same entity." *See* 47 U.S.C. §§ 227(c)(1), (c)(5); 47 C.F.R. § 64.1200(c)(ii).

68. The penalty for each call placed in violation of the TCPA's restrictions on calling phone numbers registered on the DNC List is up to $500 per call and up to $1,500 per call if the violation is determined to be willful. *See* 47 U.S.C. § 227(c)(5).

69. In addition, the TCPA allows the Court to enjoin Defendant's violations of the TCPA's regulations prohibiting calls to phone numbers registered on the National Do-Not-Call Registry. *See* 47 U.S.C. §§ 227(c)(5)(A).

70. By placing calls and texts to Howell and the putative class members' phone numbers, which were registered on the DNC List, Defendant violated the TCPA, including, but not limited to, 47 U.S.C. §§ 227(c)(1) and the TCPA's corresponding regulations.

71. Defendant and/or those acting on its behalf knew or should have known that Howell's and the putative class members' phone numbers were registered on the DNC List.

72. Defendant and/or those acting on its behalf willfully violated the TCPA when placing the calls to Howell's and the putative class members' phones.

73. Howell and the putative class members are entitled to damages of up to $500.00 per violation for each call made by Defendant and/or those acting on its behalf that the Court finds

violates the TCPA and up to $1,500.00 per violation if the Court finds that Defendant and/or those acting on its behalf willfully violated the TCPA.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff Velma Juanita Howell, individually, and on behalf of all others similarly situated, request that the Court:

a.  Enter an order pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3), certifying the proposed class, appointing Howell as the class representative, and appointing Howell's counsel as class counsel;

b.  Enter judgment in favor of Howell and the DNC List Class members for all damages and other relief available under the TCPA, 47 U.S.C. § 227(c), including injunctive relief, statutory damages of $500 per violation, and up to $1,500 per violation if Defendant willfully violated the TCPA;

c.  Enter a judgment in favor of Howell and the Class that enjoins Defendant from violating the TCPA's provisions and regulations;

d.  Enter judgment in favor of Howell and the Class for all applicable pre-judgment and post-judgment interest amounts;

e.  Enter judgment in favor of Howell and the Class for all costs; and,

f.  Award Howell and the Class members such further and other relief the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Please take notice that Velma Juanita Howell demands a jury trial.

.

**BUTSCH ROBERTS & ASSOCIATES LLC**

<u>/s/ Christopher E. Roberts</u>
Christopher E. Roberts #24528
7777 Bonhomme Avenue, Suite 1300
Clayton, Missouri 63105
Telephone: (314) 863-5700
Fax: (314) 863-5711
croberts@butschroberts.com

KIMMEL & SILVERMAN, P.C.

Jacob U. Ginsburg, Esq. (phv anticipated)
30 East Butler Ave.
Ambler, PA 19002
Phone: (267) 468-5374
Facsimile: 877-788-2864
jginsburg@creditlaw.com
teamkimmel@creditlaw.com

*Attorneys for Plaintiff*